**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

JOHN DOE,                                                   :
                                                            :   **Civil Action No:**
                         **Plaintiff,**                     :
                                                            :
                                                            :
             -against-                                      :
                                                            :
                                                            :   <u>**JURY TRIAL DEMANDED**</u>
**HOFSTRA UNIVERSITY**;                                     :
**BOARD OF TRUSTEES OF HOFSTRA**                            :
**UNIVERSITY**;                                             :
                                                            :
                     **Defendants.**                        :

-----------------------------------------------------------------------X

<u>**COMPLAINT**</u>

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by his attorneys, Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendants Hofstra University ("Hofstra" or "the University") and the Board of Trustees of Hofstra University (the "Board"), respectfully alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.    This is an action for damages against Hofstra for condoning and/or failing to adequately address severe, pervasive, and objectively offensive gender-based harassment and retaliation, which resulted in Plaintiff being compelled to withdraw from the University.

2.    When Plaintiff's ex-girlfriend and fellow BFA student Jane Roe ("Roe")[2] harassed Plaintiff and told numerous students and professors alike that Plaintiff was a rapist, it had a dramatic and profound impact on his access to his education.

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.
[2] Jane Roe is a pseudonym.

3.      What is more, in a blatant act of retaliation, Roe asked Hofstra to conduct an investigation into her complaint against Plaintiff, only after learning that Plaintiff filed a Title IX Complaint against Roe for harassing Plaintiff and telling people he was a rapist.

4.      Plaintiff and his harassers were part of Hofstra's esteemed BFA in Theater Arts ("BFA") program.  The BFA program only admits 16 students per year.  The BFA students work very closely together and operate as a cohort.

5.      As a result of Roe's harassment Plaintiff was shunned by his peers and was unable to participate in his classes, resulting in Plaintiff withdrawing from two drama classes and ultimately from Hofstra.

6.      After the investigation was complete, despite Roe's admission that Roe told students and professors that Plaintiff was a rapist and Roe's further admission that Roe threatened to pursue a formal Title IX investigation against Plaintiff if he remained at Hofstra, Hofstra dismissed Plaintiff's complaint against Roe under the pretext that specific circumstances prevented the University from gathering evidence sufficient to reach a determination.

## THE PARTIES

7.      Plaintiff John Doe is a natural person and a resident of Nevada.  At all relevant times herein, Plaintiff was an undergraduate student at Hofstra University.  Plaintiff matriculated to Hofstra in the Spring of 2022 with an expected graduation date of May 2025.

8.      Hofstra University is a partially federally funded, non-profit, nonsectarian university in Hempstead, New York, with an undergraduate enrollment of approximately 6,800 students.

9.      The Board of Trustees of Hofstra University is the governing body of the University and has the sole responsibility for the management of the affairs of the University.  The Board is

comprised of no fewer than five and no more than thirty persons, plus up to ten former chairpersons. The Board of Trustees operates in accordance with the Hofstra University corporate bylaws, which are governed by the laws of the state of New York.

## JURISDICTION AND VENUE

10.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendants are residents of different states and the amount in controversy exceeds $75,000. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972 and Title VI of the Civil Rights Act of 1964. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

11.    This Court has personal jurisdiction over the Board of Trustees on the grounds that the Board is organized under the laws of the state of New York.

12.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the acts or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Plaintiff Enrolls in Hofstra and Meets Roe

13.    Plaintiff was an outstanding student in high school, earning a GPA in excess of 4.0.

14.    During high school Plaintiff had applied to a number of different colleges including Defendant Hofstra.

15.    Hofstra offered Plaintiff admission and a very generous scholarship.

16.     Plaintiff ultimately decided to attend college closer to home and enrolled in the University of Nevada Las Vegas (UNLV) commencing in the Fall of 2021.  Plaintiff felt unfulfilled with his education at UNLV and after Hofstra emailed him that their offer of admission and scholarship were still available Plaintiff decided to transfer to Hofstra.

17.     Plaintiff commenced his studies at Hofstra in the Spring of 2022.

18.     While Plaintiff had been involved in theater as a high school student, starring in a number of school plays and as a member of the theater council, Plaintiff solidified his love of acting during his Introduction to Acting class in the Spring of 2022 and decided to major in acting.

19.     Hofstra's BFA program is highly regarded and very selective, only 16 students are admitted to the program each year.

20.     During the Fall semester of sophomore year students audition to join the BFA program.

21.     Both Plaintiff and Roe auditioned for Hofstra's BFA program in Theater Arts on or about November 7, 2022.

22.     Plaintiff first met Jane Roe in the Introduction to Acting class in the Spring of 2022. Plaintiff and Roe became casual friends, but did not interact much outside of class.

23.     In the Fall of 2022 Plaintiff and Roe were in another acting course together. Plaintiff and Roe began going to the gym together and started dating shortly thereafter.

24.     Plaintiff and Roe were in an on again/off again relationship from October through late November 2022. During their relationship the Parties engaged in consensual sexual relations.

25.     On or about November 13, 2022 the Parties were having consensual vaginal intercourse in Plaintiff's dorm room and after approximately thirty minutes Roe said something

that was unintelligible to Plaintiff and moments later Roe said "I think I'm done" and then Plaintiff immediately stopped having intercourse with her.

26.    After the intercourse concluded Roe left Plaintiff's room.

27.    The Parties spoke normally the following days and Plaintiff had no reason to believe anything was wrong.

28.    Approximately one week later Plaintiff asked Roe to have sex. Roe declined and said that Roe believed what happened between them the last time they had intercourse was sexual assault.

29.    The Parties continued their relationship for approximately one more week.

30.    While at Plaintiff's dorm room the Parties argued about Roe's desire to be friends with an individual named Percy, who Roe had kissed when Roe and Plaintiff were on a break.

31.    Plaintiff was not comfortable with Roe maintaining a friendship with Percy and Roe disapproved of Plaintiff's reaction to Roe wanting a friendship with Percy. Roe left Plaintiff's dorm.    Roe and Plaintiff's argument about Percy continued for several days leading up to November 17, 2022.

32.    The next day Roe broke up with Plaintiff via text message.

33.    Following their breakup Roe and Plaintiff were amicable and would speak to each other during the classes they had together.

**Roe Harasses and Threatens Plaintiff and Calls Him a Rapist**

34.    Upon information and belief, Roe told a number of students that Plaintiff raped Roe.

35.    As a result, some of Plaintiff's peers ignored him, several of Plaintiff's friends and classmates stopped speaking to him, and several students even scoffed at Plaintiff when he entered a classroom.

36.    Plaintiff and Roe were both admitted into the BFA program.

37.    Plaintiff and Roe were also both cast to appear in Hofstra's production of the musical "State Fair".

38.    On or about the evening of December 11, 2022, after rehearsal for "State Fair" Plaintiff and Roe walked together towards Roe's dormitory.  Plaintiff told Roe that he did not know if he would be able to return to Hofstra the following semester due to the hostile environment he faced as a result of Roe telling others that Plaintiff assaulted them[3]. In what appeared to be an effort to console Plaintiff, Roe responded that Roe really had no claims against him. Plaintiff and Roe concluded the conversation by agreeing that they could remain friends.

39.    On or about the evening of December 12, 2022, Roe learned that Plaintiff had allegedly flirted with another individual during their relationship.

40.    On or about the evening of December 12, 2022, Roe told a number of Hofstra students that Plaintiff had raped Roe including without limitation students HW[4] and SM[5].

41.    On or about December 13, 2022, Roe and Plaintiff met in front of the Starbucks in the Student Center. Roe told Plaintiff Roe felt betrayed that he "cheated" on Roe during their relationship by flirting with another student. Roe advised that Roe heard that a female student approached Plaintiff at a Halloween party and told Plaintiff she thought he was "hot" and that

---

[3] Roe prefers the pronouns "they" "them".
[4] Plaintiff is using initials to protect the student's anonymity.
[5] Plaintiff is using initials to protect the student's anonymity.

Plaintiff responded that he also thought she was attractive. Roe told Plaintiff that Roe considered that cheating. Plaintiff denied that was cheating.

42.    Roe then told Plaintiff that on second thought Roe realized that Roe had a case against him. Roe's remark prompted Plaintiff to begin to record their conversation.

43.    Roe then threatened Plaintiff that if he returned to Hofstra the next semester Roe would file a Title IX Complaint against Plaintiff.

44.    Plaintiff told Roe that he did not appreciate being threatened.

45.    Upon information and belief subsequent to their conversation on or about December 13-15, 2022, Roe told numerous students that Plaintiff raped them and advised whomever Roe told that they could "tell everyone".

### With Roe's Approval, SM Tells the Jury that Plaintiff Assaulted Roe

46.    Roe's friend SM had auditioned for the BFA program, but was denied admission.

47.    Upon information and belief SM told other Hofstra students that she was "mad" that Plaintiff was admitted to the BFA program, but she was not.

48.    At the end of the semester students who were not admitted to the BFA program may appear before a "jury" of the professors to learn why they were not admitted and to discuss why they believed they should have been admitted.

49.    On or about December 14, 2022 SM appeared before a jury composed of Professors Chris Dippel, Robert Westly and Cindy Rosenthal, where she was visibly upset about not being admitted to the BFA program.

50.    At the end of her jury appearance SM stated just so you know: "Plaintiff sexually assaulted Roe".

51.    On or about December 15, 2022, the Parties met at the Student Union adjacent to the pizza store and the Starbucks.

52.    Plaintiff asked Roe if she could advise him who Roe told that Plaintiff was a rapist and Roe responded: "I told people it's okay to tell everyone [that Plaintiff raped Roe] now, and I'm pretty sure most of the sophomores know…pretty sure most of the drama department knows by now because it spreads."

53.    Roe also told Plaintiff that SM told her jury that Plaintiff raped Roe.

54.    Roe approved of SM telling the professors on the jury that Plaintiff sexually assaulted Roe.

**Roe Files a Title IX Complaint Against Plaintiff "for informational purposes" and Asks Hofstra Not to Investigate**

55.    Also, on or about December 15, 2022, Roe reported to Hofstra's Office of Public Safety that Plaintiff assaulted her, but stated that Roe only wanted a No Contact Order and did not want to pursue an investigation.

56.    Hofstra failed to advise Plaintiff that Roe filed a complaint at that time.

57.    On December 16, 2022, Hofstra sent Plaintiff a No Contact Order in connection with Roe's Title IX Complaint.

58.    Roe had stated that: "I'm reporting for informational purposes and request a no-contact order at this time".

**Plaintiff Endures an Exceedingly Hostile Education Environment**

59.    Plaintiff continued in the BFA program, but Roe created an extremely hostile environment for Plaintiff.

60.    The BFA program is very small and operates as a cohort.

61.    Roe's intentional harassment had a profoundly negative effect on Plaintiff's classroom environment and his experience in the BFA program.

62.    The students often work collaboratively, acting out scenes with a partner and providing feedback on each other's work.

63.    Plaintiff and Roe had three of their five classes together and were in the production "State Fair" together.

64.    Since Roe had begun telling students and faculty that Plaintiff is a rapist Plaintiff has been ostracized and treated like a leper.

65.    BFA Students requested not to be paired with Plaintiff for scene work.

66.    The BFA students did not give Plaintiff any feedback on his performances.

67.    Whenever Plaintiff walked into a room he was met with glares, audible scoffing and a palpably negative atmosphere.

68.    All of Plaintiff's friends at Hofstra stopped speaking to him.

69.    A number of Plaintiff's former friends intimated to Plaintiff that they could not stay friends with him due to Roe telling everyone that Plaintiff was a rapist.

70.    The hostile environment had a direct and significant effect on Plaintiff's acting work causing him to be less vulnerable and closed off, which is the exact opposite of what the drama professors were teaching the students to do.

71.    Plaintiff's mental health significantly declined, resulting in increased anxiety, depression and frequent panic attacks.

**Plaintiff Files a Title IX Complaint**

72.    On February 6, 2022, Plaintiff filed a Title IX complaint against Roe.

73.    Plaintiff met with Assistant Director of Compliance and Title IX Investigations Natalie Johnson, who was assigned as the Title IX investigator for Plaintiff's complaint (the "Investigator").

74.    On February 8, 2023, Hofstra sent Roe a Notice of Allegations/Investigation regarding Plaintiff's title IX Complaint.

75.    Upon information and belief, the Investigator had been trying to schedule an interview with Roe from February 8, 2023.

76.    On February 22, 2023, Roe appeared at Hofstra's Public Safety Information Center stating that Roe now wanted Hofstra to move forward with an investigation into their complaint against Plaintiff.

**The Discrimination and Hostile Environment Suffered by Plaintiff Continues**

77.    Plaintiff was compelled to withdraw from two of his BFA drama courses in February 2022, due to the hostile environment he suffered as a result of Roe's actions.

78.    The classes Plaintiff withdrew from are "social classes" where students have to work collaboratively a majority of the time.

79.    Plaintiff's withdrawal from those classes put him behind and not on track to graduate on time.

80.    On February 22, 2022, Plaintiff's professor/academic advisor Ilona Pierce asked why he had withdrawn from two drama courses, and Plaintiff responded that he was compelled to withdraw from because he could not tolerate being in an environment where everyone hates him.

81.    When Ms. Pierce described this meeting to the Title IX investigator she noted: "The toll that the shunning had taken on [Plaintiff] is dramatic. He was very emotional and teary."

82.    The hostile environment Plaintiff suffered was further evident at Hofstra's production of the musical State Fair.

83.    A number of BFA students participated in the musical, which ran from March 10-16, 2023.

84.    Each night at the conclusion of the show when each student walked out of the stage door they were met with loud cheering with Plaintiff as the notable exception.

85.    In mid-April Plaintiff had to advise another one of his professors that he could not participate in an upcoming project where the students would be interacting with each other.

86.    When describing this meeting to the Title IX investigator, the professor noted that Plaintiff seemed "distraught" and that he encouraged Plaintiff to seek help.

**Hofstra Investigates Plaintiff's Complaint**

*Interviews with Roe and Roe's Friends*

87.    The Investigator met with Roe on March 1, 2023, in response to Plaintiff's allegations.

88.    Roe admitted during the interview that Roe met with Plaintiff at Starbucks in mid-December 2022[6] and that Roe told Plaintiff that they would move forward with an investigation into the alleged sexual assault if Plaintiff remained at Hofstra.

89.    Roe framed this to the investigator as not a "threat" but a "fact."

90.    Roe further admitted that in November Roe told several students that Plaintiff assaulted Roe including HW and SM, and that Roe later told Professors Ilona Pierce and Meredith VanScoy.

91.    Roe also disclosed that SM told the BFA jury that "Plaintiff was a rapist".

---

[6] Roe incorrectly stated that Roe met with Plaintiff on December 14th. Plaintiff provided proof that they met on December 13th.

92.    Plaintiff provided the Investigator with a recording of a conversation between him and Roe, where in no uncertain terms Roe threatened to file a Title IX complaint against Plaintiff if he returned to Hofstra the following semester: "Leave or I'm pressing charges with Title IX."

93.    Roe advised Plaintiff that Roe told several other students that Roe withdrew consent and then Plaintiff assaulted Roe.

94.    Further in the conversation Roe told Plaintiff that Roe "[knew] for a fact" that he "didn't mean to" assault them.

95.    At the end of the conversation Roe apologized to Plaintiff and said: "I miss you so much" and as Roe was leaving Roe said: "I love you, I'm sorry, goodbye".

96.    Plaintiff provided the Investigator with a recording and transcript from a second conversation when the Parties met again on or about December 15th at the Student Center.

97.    Roe admitted to Plaintiff: "I told people it's ok to tell everyone now, [that Plaintiff is a rapist] and I'm pretty sure most of the sophomores know" and "Pretty sure most of the drama department knows by now because it spreads."

98.    Roe continued: "SM said in her jury that they let a rapist into the program" and that one of the professors on the jury, Chris Dippel, reported Plaintiff to the Title IX office. Roe said: "I told a lot of people that you assaulted me."

99.    The Investigator interviewed HW on March 7, 2023.

100.    HW divulged during her interview that Roe told HW that Plaintiff raped Roe.

101.    HW also stated that SM was "mad" that Plaintiff was admitted into the BFA program and that Roe gave SM: "the ok to tell people in her jury about the assault."

102.    HW told the Investigator that the people in the BFA program were aware of the alleged assault and that it was extremely uncomfortable whenever Plaintiff walked into a room.

103.    The Investigator interviewed SM on March 8, 2023.

104.    SM told the Investigator that she told the professors at her jury that Plaintiff assaulted Roe because it was "only fair" that they and the BFA know.

105.    SM also confirmed that Roe gave her permission to tell the professors at her jury about the alleged assault.

106.    SM also added that she did not know Plaintiff well, but that he seemed nice.

*Interviews with Professors and Plaintiff's Mother*

107.    The Investigator interviewed Professor Christopher Dippel on March 7, 2023.

108.    Professor Dippel confirmed during his interview with the Investigator that SM was very unhappy about not being admitted into the BFA program and that she stated at the end of her jury that Plaintiff assaulted Roe.

109.    Professor Dippel said he immediately reported the incident to the Title IX office.

110.    Professor Dippel also reported to the Investigator that the "alleged incident was common knowledge among the BFA students because they are close like a cohort, moving through the program together and [he] would not be surprised if [Plaintiff] was having a difficult time.

111.    On March 10, 2023, Plaintiff added a claim for retaliation to his Title IX Complaint against Roe. Plaintiff noted that for months Roe had threatened him that Roe would pursue a Title IX complaint against Plaintiff and had spoken to other students about it.  Roe sought to bully Plaintiff to leave Hofstra. Finally, shortly after Plaintiff filed a Title IX Complaint against Roe, Roe carried out Roe's threat and in retaliation asked Hofstra to investigate Roe's complaint against Plaintiff.

13

112. The investigation conclusively confirmed that Roe had threatened to file a Title IX complaint against Plaintiff if he did not withdraw from Hofstra and that Roe told numerous individuals at Hofstra that Plaintiff is a rapist.

113. The Investigator interviewed Professor Cindy Rosenthal on March 15, 2023.

114. Professor Rosenthal was a member of SM's jury and confirmed that SM stated Plaintiff has assaulted Roe.

115. Plaintiff and Roe were both in Professor Rosenthal's class that semester. Professor Rosenthal advised that Plaintiff missed several classes and that she noted difficulties within the class including that Plaintiff was isolated.

116. Professor Rosenthal noticed that the other students do not comment on Plaintiff's performances to the same extent as they do for other students, the comments are less in number and depth.

117. Professor Rosenthal also noted that two students aside from Roe requested not to be paired with Plaintiff during scene work.

118. Professor Rosenthal commented that this was the first "real" acting class they are taking as BFA students, which is at a "pre-professional level" and therefore the stakes are higher than classes from their freshman year.

119. Professor Rosenthal expressed concerns to the Investigator regarding the final project in the class where students have to choose a partner/group to work with and perform for the rest of the class. She was concerned that no one would work with Plaintiff, which would be a detriment to his performance.

120.     On March 17, 2023, the Investigator interviewed Professor Ilona Pierce. Professor Pierce told the Investigator that Plaintiff dropped two Drama courses and picked up two electives, which has put him behind and not on track in the program to graduate on time.

121.     Professor Pierce said she asked Plaintiff why he dropped the classes and Plaintiff responded: "everybody hates me" and he "can't be in an environment where everybody hates me."

122.     During Professor Pierce's first class of the spring semester when there were only 15 students present (all of the BFA students except Plaintiff), one of the students remarked: "that's everyone, we're all here" in a very animated way. Moments later when Plaintiff walked in the entire class stiffened and tightened up.

123.     Explaining some of the dynamics in class to the Investigator, Professor Pierce stated that at the end of student performances in class students get "snaps" and "claps" but often Plaintiff will get nothing, which is negatively affecting Plaintiff's work because part of acting is to be vulnerable and Plaintiff is closed off, trying to protect himself.

124.     Discussing the climate in the class, Professor Pierce said she is aware that rumors are circulating around the students in the department about what happened - one such rumor is that Roe and Plaintiff were drunk at a party and they started kissing then at some point boundaries were not discussed or boundaries were crossed and the behavior went beyond what one of them was comfortable with.

125.     When asked about any differences between the class dynamics last semester and this semester, Professor Pierce stated she had Plaintiff as a student last semester and she reported that there were no identifiable issues and his work was good, which changed this semester, with the foregoing issues.

126.    On April 18, 2023 the Investigator interviewed Plaintiff's mother. Plaintiff's mother explained that Plaintiff had been suffering and isolated in school since Thanksgiving 2022.

127.    Plaintiff's mother explained that she flew from her home in Las Vegas to see Plaintiff perform in Hofstra's production of State Fair.

128.    Plaintiff's mother said that at the end of play, friends and family stand at the stage door waiting for the actors to come out and cheer for them. Plaintiff's mother stated that when the students came out everyone was cheering but when Plaintiff came out it was "silent" and no one cheered for him and that this happened both nights she went.

129.    Plaintiff's mother also noted that Plaintiff's classes are very difficult. For example, Plaintiff is the only person in his dance class without a partner because no one will work with him.

130.    On April 21, 2023, the Investigator interviewed Professor Robert Westly. Professor Westly noted that Plaintiff came to see him as he was concerned about an upcoming project which required students to interact with each other for the first time that semester. Professor Westly commented that Plaintiff was "distraught".

131.    Professor Westly said that he gave Plaintiff the option of observing but stated that Plaintiff said that would make the environment more awkward. As a result, Professor Westly said that Plaintiff could not participate and that he would find Plaintiff an alternative assignment.

132.    The Investigation Report for Plaintiff's Complaint was issued in mid-April.

**Roe Further Harasses and Retaliates Against Plaintiff Through a Performance in Professor Rosenthal's Class**

133.    On or about April 27, 2023, Roe and her scene partner performed a scene (Scene 8 specifically) from the play *Doubt* in Plaintiff's presence during Professor Rosenthal's class.

134.    The subject scene involved a nun accusing a priest of sexually assaulting a young boy and demanding that the priest confess and resign.

16

135.    Roe intentionally chose the scene to mirror Roe's harassment of Plaintiff, where Roe falsely accused Plaintiff of sexually assaulting Roe and demanded that he leave Hofstra.

136.    Plaintiff was obviously extremely disturbed by Complainant's performance.

137.    Plaintiff was also taken aback that Professor Rosenthal, who was keenly aware of the situation between Plaintiff and Roe, sanctioned Roe's retaliatory and harassing behavior by approving Roe's scene selection.

138.    What is more, prior to Roe's performance Professor Rosenthal asked Roe if Roe thought the priest character was "getting away with stuff because he is a man," another obvious taunt directed at Plaintiff.

139.    Accordingly, on or about the evening of April 27, 2023, Plaintiff emailed the Investigator requesting to add an additional charge of retaliation against Roe and to file a formal Title IX Complaint against Professor Rosenthal.

140.    On May 2, 2023, Lisa Bellairs, senior assistant to Comila Shahani-Denning, Ph.D. Senior Vice Provost for Academic Affairs, reached out to Plaintiff to schedule a meeting with Dr. Shahani-Denning to discuss Plaintiff's concerns.

141.    Plaintiff wrote back to Ms. Bellairs that he wanted his advisor present for that meeting. Plaintiff and Ms. Bellaris scheduled a Zoom meeting for Plaintiff, Plaintiff's advisor and Dr. Shahani-Denning at 2:40PM on May 3, 2023.

142.    Minutes before the scheduled meeting Plaintiff saw an email advising Plaintiff that because his advisor was not a "Hofstra Advisor" that he would not be able to attend the meeting and Plaintiff's advisor was indeed barred from entering the meeting.

143.    Plaintiff's advisor emailed Hofstra's general counsel Jennifer Mone and Hofstra's Title IX coordinator Brittany Rhoden to advise them that he was prevented from entering Plaintiff's meeting with Dr. Shahani-Denning.

144.    Hofstra never rescheduled the meeting to include Plaintiff's advisor.

**Hofstra Declines to Investigate Harassment by Roe's Friend**

145.    On or about May 1, 2023, HW intimidated and harassed Plaintiff. In Plaintiff's drama class the students were directed to walk around the room and then stop to perform their monologue while the class turned to face the performer. When it was HW's turn to perform, she walked directly up to Plaintiff stopping mere inches from Plaintiff's face and proceeded to angrily and aggressively perform her monologue in Plaintiff's face.  The monologue was an excerpt from Act I Scene 6 of Shakespeare's *Cymbeline,* and involves a harsh and bitter condemnation of a character who is a sex offender and references the character's "assault."

146.    Upon information and belief HW's harassment was to retaliate against Plaintiff for filing a Title IX Complaint against Roe and to intimidate Plaintiff to prevent him from further pursuing the matter.

147.    On or about May 2, 2023, Plaintiff reported HW's conduct to Ms. Jonhson to the Investigator and requested a No-Contact Order.

148.    The Investigator responded, asking for more information about the monologue and "about the usefulness of a no-contact order."

149.    On June 12, 2023, the Investigator emailed Plaintiff, advising that the University did not believe that the conduct fell within a University Code of Conduct violation.

**Plaintiff is Overcome as a Result of the Harassment and Retaliation and Compelled to Withdraw from Hofstra**

150.    Plaintiff had previously struggled with anxiety and depression, and the hostile environment Plaintiff was forced to endure dramatically affected Plaintiff's ability to focus on his studies.

151.    The prospect of returning to Hofstra and the hostile environment he had endured throughout the Spring Semester was too overwhelming for Plaintiff.

152.    Due to Hofstra's failure to take any action to ameliorate the hostile environment Plaintiff endured, Plaintiff felt that he had no choice but to withdraw from Hofstra.

153.    Accordingly, in August 2023, only about two weeks prior to the commencement of the Fall 2023 semester, Plaintiff withdrew from Hofstra.

**Hofstra Offers Plaintiff a Wholly Inadequate "Informal Resolution"**

154.    On or about September 19, 2023, Felicia Winder, Hofstra's Associate General Counsel, offered Plaintiff an "Informal Resolution" that was patently insufficient.

155.    Hofstra limited the resolution to: i) having Roe attend a counseling assessment; ii) having Roe participate in a Title IX educational program; iii) a no contact order between Roe and Plaintiff; iv) Roe will not be permitted to live in the same as residential building as Plaintiff; and v) Roe will write a refection paper on what Roe has learned.

156.    Moreover, Hofstra refused to have a counselor address the students of the BFA program to address the vicious rumors Roe made against Plaintiff, as Plaintiff requested.

157.    Accordingly, Plaintiff rejected Hofstra's Informal Resolution.

**Hofstra Inexplicably Dismisses Plaintiff's Complaint**

158.    Dr. Sharmeen Ahmed sent Plaintiff a letter on October 12, 2023, stating that Roe had decided to withdraw their formal complaint against Plaintiff and, accordingly, the University

was dismissing Plaintiff's complaint against Roe. Hofstra offered absolutely no basis for the dismissal other than that Roe dismissed their complaint against Plaintiff.

159.    The next day on October 13, 2023, Dr. Ahmed emailed Plaintiff a pretextual rationale for the dismissal stating: "the University, within its discretion, has dismissed this [Plaintiff's] complaint pursuant to the provision in our Title IX Grievance Policy in that 'specific circumstances prevent the University from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.'"

160.    However, the investigation report had been finalized for months at that point.  The only thing that needed to be done was a hearing, and Plaintiff had expressed to Hofstra his willingness to participate in a hearing.

**Hofstra Denies Plaintiff's Appeals**

161.    On October 19, 2023, Plaintiff wrote to Hofstra to appeal the dismissal of his complaint.

162.    Plaintiff's appeal was based on the first basis for appeal: "Procedural irregularity that affected the outcome of the matter."

163.    Plaintiff wrote: "Dr. Ahmed and Hofstra has violated the University's policy in dismissing my complaint against [Jane Roe]. The dismissal was and is without my consent. Dr. Ahmed never asked me if I wanted to continue with my complaint, **which I do**. Hofstra completed its investigation, and the matter was ready to proceed to a hearing when Hofstra decided to dismiss my case. Clearly, Hofstra's unilateral decision to dismiss my complaint affected the outcome of the matter."

164.    On October 23, 2023, Zaibis M. Munoz-Isme Assistant Vice President of Student Enrollment, Engagement and Success provided Plaintiff with a copy of Roe's response to Plaintiff's appeal.

165.    Roe's two sentence response parroted Dr. Ahmed's exact pretextual rationale for dismissing Plaintiff's complaint.  Specifically, Plaintiff wrote: "Dr. Ahmed has informed me in no uncertain terms that [Plaintiff] is no longer enrolled at Hofstra, and therefore the university is well within their rights to dismiss his case under the discretionary dismissal policy. There has been no "procedural irregularity.""

166.    On November 9, 2023, Zaibis M. Munoz-Isme wrote to Plaintiff that Hofstra was denying his appeal as: "There is no requirement under the Policy wherein either of the parties must consent to a Discretionary Dismissal by the University. For these reasons, your appeal is denied."

167.    However, that was not the basis of Plaintiff's appeal.  Plaintiff appealed citing to the procedural irregularity that Hofstra dismissed his complaint without any grounds for doing so in the Policy.

168.    The Policy provides three bases for discretionary dismissal:

o   A complainant notifies the Title IX Coordinator for Student Issues in writing that they would like to withdraw the Formal Complaint or any allegations raised in the Formal Complaint;
o   The respondent is no longer enrolled at the University; or,
o   Specific circumstances prevent the University from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.

169.    Per the procedure outlined in the Policy, Plaintiff submitted a final appeal to the Senior Vice President of Student Enrollment, Engagement, and Success Jessica L. Eads on November 14, 2023.

170.    Plaintiff aptly noted in his appeal:

> Hofstra completed its investigation, and the matter was ready to proceed to a hearing when Hofstra decided to dismiss my case, only after [Roe] dismissed their complaint against me. Unfortunately, it appears abundantly clear that Hofstra did not want to be in a position where it had to sanction [Roe], while having no leverage against me, a male.

171.    On November 30, 2023, Vice President Eads wrote to Plaintiff repeating the same tired and irrelevant justification that the parties need not consent to a mandatory dismissal.

172.    Neither Vice President Munoz-Isme nor Vice President Eads articulated any rationale in the Policy for dismissing Plaintiff's Complaint.

**Hofstra's Policies And Contract With Plaintiff**

173.    Upon Plaintiff's acceptance into Hofstra, Hofstra provided Plaintiff with a copy of the Hofstra University "Guide to Pride" 2022-2023 academic year Student Handbook ("the Handbook"), which contains Hofstra's various policies on student conduct, discipline, and students' rights and responsibilities.  The Handbook also contains the Student Policy Prohibiting Discriminatory Harassment, Relationship Violence and Sexual Misconduct ("the Policy"), which is the applicable policy for Hofstra's Title IX procedures.

174.    On information and belief, the Handbook is updated and/or reissued each new school year.

175.    On information and belief, the Handbook and/or the various policies contained therein, are also available online on the Hofstra university website.

176.    The Handbook constitutes and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Hofstra University.

177.    The Policy prohibits Covered Sexual Harassment, which is defined as inter alia: "Unwelcome conduct that a reasonable person would determine is so severe, pervasive, and

objectively offensive that it effectively denies a person equal access to the University's education program or activity."

178. The University correctly determined that Roe's conduct against Plaintiff qualified as Covered Sexual Harassment.

179. Hofstra violated the Policy when it prevented Plaintiff's advisor from being present at Plaintiff's meeting with Dr. Shahani-Denning.

180. The Policy provides in pertinent part: "Both the complainant and the respondent will have the right to be accompanied by an advisor of choice who may assist and advise the student throughout the conduct process under this Policy, including during **all meetings** and hearings relating to the process."

181. Plaintiff's advisor of choice was prohibited from attending an important meeting between Plaintiff and Dr. Shahani-Denning without any explanation and in violation of the Policy.

182. Hofstra further violated the Policy when it unilaterally dismissed Plaintiff's Complaint without any basis.

183. The University had previously determined that it had jurisdiction over Plaintiff's Complaint and that the alleged conduct if true would constitute Covered Sexual Harassment. Accordingly, there was no basis for a mandatory dismissal under the Policy.

184. As described above, the Policy provides three bases for discretionary dismissal:

o A complainant notifies the Title IX Coordinator for Student Issues in writing that they would like to withdraw the Formal Complaint or any allegations raised in the Formal Complaint;
o The respondent is no longer enrolled at the University; or,
o Specific circumstances prevent the University from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.

185. None of those conditions were present here.

23

186.    Plaintiff never notified the University that he wanted to withdraw the Complaint. The Respondent Jane Roe remained at the University.  And no circumstances prevented the University from gathering evidence as the investigation had already concluded and all that remained was the hearing.

187.    The only plausible reason for the University's dismissal of the Complaint is the University's bias against Plaintiff as a male student and unwillingness to find Roe, a female student, responsible for a violation of the Policy.

**New York State Education Law Article 129-B.**

188.    On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq*.

189.    Art. 129-B applies to "any college or university chartered by the regents or incorporated by special act of the legislature that maintains a campus in New York," including Hofstra University.  *See* N.Y. Educ. Law 6439(1).  It mandates that all such institutions, including Hofstra, adopt certain rules and procedures in connection with their sexual misconduct policies.

190.    Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute.  If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.  Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

191.    In that regard, Art. 129-B sets forth a standard of care with which universities, including Hofstra, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

192.    In the instant case, Hofstra and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by Art. 129–B.  As a result of this breach, Plaintiff suffered damages including loss of tuition payments, loss of education, and loss of future educational and career opportunities.

193.    Art. 129-B mandates that all New York State institutions of higher education, including Hofstra, "shall ensure" that every student be afforded inter alia, the right "[A] prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner";

194.    Article 129-B also mandates that educational institutions "shall" adopt and implement a "Students' Bill of Rights," which must include, at minimum:

   a.   The right to "[p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard";

   b.   The right to "[b]e protected from retaliation by the University, any student, . . . and/or their friends, family and acquaintances within the University's jurisdiction";

195.    Hofstra's Student Handbook expressly incorporates the Students' Bill of Rights. Student Handbook at p. 68.

196.    Defendants breached their duty of care under the New York Education Law and their contractual obligations under the Hofstra Student Handbook by inter alia: (i) failing to protect Plaintiff from retaliation by Roe and their friends; and (ii) improperly dismissing Plaintiff's complaint without a hearing and without adjudicating the Complaint.

197.    As a reasonably foreseeable result of Defendants' breach of their duties under the New York Education Law, Plaintiff was ostracized by his peers in the BFA program and unable

25

to participate and contribute to his classes, which ultimately lead to Plaintiff having to withdraw from the University.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Violation of Title IX of the Education Amendments of 1972)
#### (Deliberate Indifference)

198.    Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

199.    Hofstra has a recent history of overzealously disciplining male respondents.  After being subject to two OCR investigations and widely criticized for not adequately handling reports of sexual assault by female students, Hofstra engaged in a public campaign to demonstrate its resolution to seriously deal with sexual assault allegations.

200.    In 2015, while Hofstra was under its second OCR investigation, Hofstra introduced a new initiative called "It's On Us," aimed at raising awareness about sexual assault.  The program was panned in an editorial published in Hofstra's school newspaper, The Hofstra Chronicle, as little more than a publicity stunt and a waste of University resources.  *See* Julie Rafatpanah, *It's On Us Fails to Discuss Sexual Assault*, The Hofstra Chronicle (Mar. 2, 2015), https://www.thehofstrachronicle.com/archive-2015/its-on-us-fails-to-discuss-sexual-assault?rq=sexual%20assault.

201.    The author of the article remarked that Hofstra's initiative lacked substance and appeared to be more of a marketing campaign.

202.    In response to the editorial, a member of Hofstra's Its On Us programming committee defended the program in a letter to the editor stating that: "[t]he students, faculty and staff of Hofstra University all want the same thing – to effectively, and hopefully one day permanently, put an end to sexual assault of all kinds, by whatever means necessary."  *See* Jackie

Bakewell, *Letter to the Editor: In Response to "It's On Us fails to discuss sexual assault,"* The Hofstra Chronicle (Mar. 10, 2015), https://www.thehofstrachronicle.com/archive-2015/letter-to-the-editor-in-response-to-its-on-us-fails-to-discuss-sexual-assault?rq=sexual%20assault (emphasis added).

203.    Hofstra's very public ramping up of its sexual assault awareness efforts, coinciding with its second OCR investigation for failing to adequately address sexual misconduct claims, evidences the pressure Hofstra felt from both students and the federal government to better address claims of sexual misconduct and to ensure that accused students faced punishment.

204.    On November 9, 2017, The Hofstra Chronicle published an op-ed piece praising the increased number of women speaking out against sexual assault since the inception of the "Me Too" movement. *See* Delilah Gray, *Opinion: The Weinstein Effect: Why Women Are Speaking Out* (Nov. 9, 2017), https://www.thehofstrachronicle.com/archive-2017/opinion-weinstein-effect-women-speaking?rq=sexual%20assault.    The piece focused on female victim advocacy specifically, and noted that "[t]he time where people would throw around the phrase, '[b]oys will be boys' is coming to an end.  Boys, like everyone else, will be held accountable for their actions." *Id.* (emphasis added).

205.    On information and belief, in April 2018 Hofstra hosted its first-ever Sexual Assault Awareness Month (SAAM). Throughout the month, Hofstra held numerous activities on campus in support of sexual assault survivors and focusing on awareness and prevention.  Notably, the first of these events was about the "Start by Believing" campaign.  According to a description of the event promoted by Hofstra, "[i]n the wake of the #MeToo movement, many people have asked what they can do to support survivors.  For Sexual Violence Awareness Month, the Safe Center LI is asking

27

that we #StartByBelieving.  Through this social media campaign, we will be asking students to take the pledge and share why they think it is important to believe survivors of sexual violence."

206.    In May 2018 Hofstra approved the creation of a new student-led Title IX advisory board.  The purpose of the student board was to work with school administrators "to make sure that the policies of Title IX are as transparent as possible and ensur[e] that students feel comfortable with and are aware of resources that are available."  *See* Melanie Haid, *Student Board Approved to Work Alongside Title IX, The Hofstra Chronicle* (May 8, 2018), https://www.thehofstrachronicle.com/category/news/2018/5/8/student-board-approved-to-work-alongside-title-ix.

207.    In September 2018, The Hofstra Chronicle published another article echoing the sentiments of the aforementioned November 2017 editorial piece: that Hofstra was not sufficiently responding to allegations of sexual assault, and that Public Safety specifically was insufficiently attentive to victims' needs and sensitivities.  *See* Carissa Ramirez, *Still a Long Way to Go For Title IX at Hofstra*, The Hofstra Chronicle (Sept. 17, 2018), https://www.thehofstrachronicle.com/category/editorials/2018/9/17/still-a-long-way-to-go-for-title-ix-at-hofstra.

208.    The article opens with this bleak assessment of Title IX procedures at Hofstra: "It's fairly common knowledge among students on Hofstra's campus that Title IX reports are not always taken seriously and that Hofstra's culture around sexual misconduct in general needs improvement."  The article went on to accuse Public Safety of "victim-blaming" reporting students, and argued that "[s]tudents who have been victim-blamed in the past find their claims to be denied and invalidated by administrators, likely because if the claims were to be taken seriously, that would serve as proof that Hofstra University broke state educational law. Rather than improving students',

specifically survivors', experiences, Hofstra would rather save itself the potential legal troubles and not address inappropriate and, frankly, illegal behaviors."

209.    In response to this article, Vernace and Denise Cunningham, Hofstra's Title IX officer for employee conduct, then submitted their own editorial, reassuring students that Hofstra is dedicated to enforcing Title IX and supporting victims of sexual assault.  *See* Allison Vernace & Denise Cunningham, *Re: Title IX*, The Hofstra Chronicle (Oct. 1, 2018), available at https://www.thehofstrachronicle.com/category/editorials/2018/10/1/re-title-ix.   In the article, the Title IX coordinators praised the new student Title IX board and noted the board had already effected a policy change: increasing the time for students to report misconduct from six months to one year.

210.    On April 22, 2019 The Hofstra Chronicle published a scathing rebuke of Hofstra's Title IX office entitled *Title IX: The do-nothing office*. See Drew Perkoski, The Hofstra Chronicle (Apr.              22,              2019)              available              at https://www.thehofstrachronicle.com/category/editorials/2019/4/22/title-ix-the-do-nothing-office?rq=title%20ix.   The author described himself as an 18-year old white male and "the stereotype image of campus sexual assault" and a victim of sexual assault.  The article detailed how the Title IX office found his attacker not responsible despite the fact that the attacker admitted to the assault in a group chat. The Title IX office accused the author of retaliation, ultimately finding him not responsible, but only after undergoing a full adjudication of the claim.

211.    More recently in December 2022, The Hofstra Chronicle published an Op-Ed lamenting that: "the few repercussions that accused students face shows that the university doesn't take victim safety as seriously as it should." See *Protect students: Take Title XI violations seriously,* The              Hofstra              Chronicle              (Dec.              6,              2022),              available              at

29

https://www.thehofstrachronicle.com/category/editorials/2022/12/6/protect-students-take-title-xi-violations-seriously?rq=title%20ix. The article further criticized Hofstra claiming: "More students are victims than they should be: even one is too many. The lack of punishment for harassment and abuse at Hofstra allows offenders to repeat their behavior consequence free."

212.   In light of Hofstra's lengthy history of OCR investigations, the constant criticism from its students that it does not sufficiently respond to reports of sexual assault or punish respondents, and Hofstra's very vocal, very active efforts to ensure its students that it is dedicated to addressing sexual assault claims, it is not surprising that Hofstra chose to dismiss the complaint brought by Plaintiff, a male (wrongfully accused of sexual assault) despite having no basis in the Policy for doing so.

213.   Hofstra has a history of failing to discipline a female perpetrator.

214.   In April 2018, the New York Supreme Court vacated a Title IX finding and sanction imposed by Hofstra's Title IX office against a male respondent, finding Hofstra prevented the male respondent from properly preparing for his case, and unevenly, unfairly applied its policies; specifically, that it failed to respond to numerous policy violations by the female complainant, while finding the male respondent responsible for violations for which there was no credible evidence in the record. *See Hall v. Hofstra Univ.*, 59 Misc. 3d 1214(A) (N.Y. Sup. Ct. 2018).

215.   The court ordered the finding and sanction to be dismissed, noting that Hofstra failed to "exercise . . . honest discretion after a full review of the operative facts," and that Hofstra's attempts to procedurally hobble respondent's defense of his case were "troubling." *Ibid.*

216.   Hall subsequently filed a complaint in federal court Case No.: 2:20-cv-02638-JS-ST, alleging that Hofstra violated Title IX under Hostile Education Environment/Discrimination/Sexual Harassment/ Deliberate Indifference and Erroneous Outcome

theories. Hall alleged, similar to the Plaintiff here, that Hofstra violated Title IX by failing to investigate/discipline the female complainant despite evidence of her policy violations.

217.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

218.    Title IX is enforceable through a private right of action.

219.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.  According to its 2022 Consolidated Financial Statement, Hofstra receives federal funding.

220.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

221.    Such prohibited actions include all forms of sexual harassment. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19 20, 21 & nn. 98-101.

222.    Plaintiff was sexually harassed by being wrongfully labeled as a rapist and as a result was ostracized from his fellow students.

223.    Hofstra, in violation of Title IX, intentionally discriminated against Plaintiff on the basis of his male sex by condoning a hostile educational environment by knowingly permitting the continuing harassment of Plaintiff.  Roe admitted to telling numerous individuals that Plaintiff was a rapist. Roe further admitted that Roe only sought to pursue a Title IX Complaint against Plaintiff

after Plaintiff filed a complaint against Roe.

224.    The failure of a university to promptly and adequately address Plaintiff's complaints of sexual harassment amounts to "deliberate indifference" for which Hofstra may be held liable under Title IX.

225.    Hofstra's failure to: i) promptly and adequately address Plaintiff's complaints of sexual harassment; ii) refusal to permit Plaintiff's advisor of choice from attending a meeting with Dr. Shahani-Denning; iii) failure to complete its adjudicatory process in violation of the Policy; iv) its failure to take real steps to stop the harassment and address its effects, was knowing, intentional, and unreasonable; and v) dismissal of Plaintiff's appeals without due consideration.

226.    As a direct and proximate result of Hofstra's deliberate indifference to Plaintiff's complaints of sexual harassment in violation of Title IX, Plaintiff was subjected to a hostile educational environment while attempting to pursue his education on Hofstra's campus.

227.    Plaintiff was completely ostracized from his BFA cohort became anxious and depressed and was forced to withdraw from two drama classes and ultimately could not return to Hofstra.

228.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including without limitation, damages to physical well-being, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Violation of Title IX of the Education Amendments of 1972(Hostile Environment)**

229.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

230.    A Title IX hostile education environment claim is governed by traditional Title VII

"hostile environment" jurisprudence. *Papelino v. Albany Coll. of Pharm. Of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011); *Doe v. Sarah Lawrence College*, 453 F. Supp. 3d 653, 666 (S.D.N.Y. 2020).

231.   A hostile environment claim under Title IX requires a plaintiff to show that: 1) he subjectively perceived the environment to be hostile or abusive and that 2) the environment objectively was hostile or abusive, in that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the plaintiff's educational environment. *Sarah Lawrence College*, 453 F. Supp. 3d at 666.

232.   It was clear from the investigation that Plaintiff was exposed to a subjectively and objectively hostile environment.

233.   Plaintiff was subjected to harassment based on sex when he was called a rapist and ostracized from his fellow BFA students. Plaintiff had been part of a small collaborative acting cohort, but was unable to participate in the program as he was labeled as the perpetrator of sexual assault and therefore his fellow students refused to work with him or provide feedback on his work.

234.   As described herein, the harassment faced by Plaintiff was sufficiently severe and/or pervasive to undermine, detract from and alter the conditions of Plaintiff's education such that he was effectively denied equal access to Hofstra's resources and opportunities.

235.   Plaintiff's peers ignored him or avoided him, even walking away when they saw Plaintiff approaching.

236.   As a result of the continued harassment, Plaintiff suffered severe emotional distress and mental health issues, which became so overwhelming that Plaintiff was forced to withdraw from two of his drama classes.

237.   The persistent harassment became so unbearable that Plaintiff could not return to Hofstra the following semester.

238.    As a direct and proximate result of Hofstra's failure to adequately respond to Plaintiff's complaints about the harassment he suffered and Hofstra's refusal to complete its adjudication of Plaintiff's complaint against Roe in violation of the Policy or to discipline Roe, Plaintiff was subjected to a hostile environment, which was so severe, pervasive and objectively offensive that it altered the conditions of Plaintiff's educational environment.

239.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including without limitation, damages to physical well-being, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of New York State Human Rights Law § 296(4))

240.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

241.    New York Executive Law, Article 15, Human Rights Law, Section 296(4) (McKinney Dec. 23, 2022) provides that "It shall be an unlawful discriminatory practice for an educational institution to … permit the harassment of any student … by reason of his … sexual orientation, gender identity… [or]… sex."

242.    The Policy prohibits Covered Sexual Harassment, which is defined as inter alia: "Unwelcome conduct that a reasonable person would determine is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity."

243.    Hofstra violated the Policy when it unilaterally dismissed Plaintiff's Complaint.

244.    The University had previously determined that it had jurisdiction over Plaintiff's Complaint and that the alleged conduct if true would constitute Covered Sexual Harassment. Accordingly, there was no basis for a mandatory dismissal under the Policy.

245.    The Policy provides three bases for discretionary dismissal:

- A complainant notifies the Title IX Coordinator for Student Issues in writing that they would like to withdraw the Formal Complaint or any allegations raised in the Formal Complaint;
- The respondent is no longer enrolled at the University; or,
- Specific circumstances prevent the University from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.

246.    None of those conditions were present.

247.    Plaintiff never notified the University that he wanted to withdraw the Complaint. The Respondent Jane Roe remained at the University. And no circumstances prevented the University from gathering evidence as the investigation had already concluded and all that remained was the hearing.

248.    Based on the foregoing, Hofstra permitted discrimination against John Doe on the basis of his sex.

249.    Based on the foregoing, Hofstra authorized, condoned, and/or acquiesced to discriminatory conduct against John Doe.

250.    Hofstra violated Section 296(4) of the New York State Human Rights Law by failing to adjudicate Plaintiff's complaint regarding Roe's sexual harassment.

251.    Based on the foregoing facts and circumstances, Hofstra engaged in unlawful, discriminatory practices in violation of N.Y. Exec. Law § 296(4).

252.    As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss

of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

253.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract/Covenant of Good Faith and Fair Dealing)

254.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

255.    At all times relevant hereto, a contractual relationship existed between Hofstra and Plaintiff by virtue of Plaintiff's enrollment at Hofstra and as defined by and through Hofstra policies and procedures governing the student disciplinary system, including but not limited to the Handbook and the Policy.

256.    Hofstra violated the Policy when it prevented Plaintiff's advisor from being present at Plaintiff's meeting with Dr. Shahani-Denning.

257.    The Policy provides in pertinent part: "Both the complainant and the respondent will have the right to be accompanied by an advisor of choice who may assist and advise the student throughout the conduct process under this Policy, including during **all meetings** and hearings relating to the process."

258.    Plaintiff's advisor of choice was prohibited from attending an important meeting between Plaintiff and Dr. Shahani-Denning without any explanation and in violation of the Policy.

259.    Hofstra further violated the Policy when it unilaterally dismissed Plaintiff's Complaint.

260.    The University had completed its investigation of Plaintiff's Complaint and should have proceeded to a hearing.

261.    The Policy provides three bases for discretionary dismissal:

- o   A complainant notifies the Title IX Coordinator for Student Issues in writing that they would like to withdraw the Formal Complaint or any allegations raised in the Formal Complaint;
- o   The respondent is no longer enrolled at the University; or,
- o   Specific circumstances prevent the University from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.

262.    Plaintiff never notified the University that he wanted to withdraw the Complaint. The Respondent Jane Roe remained at the University.   And no circumstances prevented the University from gathering evidence as the investigation had already concluded and all that remained was the hearing.

263.    Accordingly, there was absolutely no provision for the dismissal of Plaintiff's complaint.

264.    Plaintiff appealed the dismissal of his complaint based on procedural irregularity.

265.    Hofstra refused to reinstate the Complaint.

266.    Based on the aforementioned facts and circumstances, Hofstra breached express and/or implied agreement(s) with Plaintiff.

267.    Hofstra breached the implied covenant of good faith and fair dealing by intentionally discriminating against Plaintiff on the basis of his sex when it refused to complete the adjudication of Plaintiff's Complaint, despite having no avenue to dismiss the Complaint in the Policy.

268.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

269.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

i.  On the First Cause of Action against Defendant Hofstra for deliberate indifference in violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, damages to reputation, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, ii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Hofstra intentionally discriminated against Plaintiff  on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Hofstra students to engage in prolonged gender-based harassment of and gender-based misconduct as to Plaintiff and permitting that gender-based harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said gender-based harassment and gender-based misconduct, with the consequence that Plaintiff was denied equal access to Defendant Hofstra's resources and opportunities, thereby altering Plaintiff's educational experience;

ii.  On the Second Cause of Action against Defendant Hofstra for creating a hostile environment in violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff: i) damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, damages to reputation, past and future economic losses, loss of educational, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, ii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Hofstra intentionally discriminated against Plaintiff  on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Hofstra students to engage in prolonged gender-based harassment of and gender-based misconduct as to Plaintiff and permitting that gender-based harassment in the school's programs and activities with actual knowledge of, deliberate indifference to and an apparent approval of said gender-based

harassment and gender-based misconduct, with the consequence that Plaintiff was denied equal access to Defendant Hofstra's resources and opportunities, thereby altering Plaintiff's educational experience;

iii.    On the Third Cause of Action, against Defendant Hofstra, for violations of New York State Human Rights Law, § 296(4), a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, damages to reputation, past and future economic losses, and loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

iv.    On the Fourth Cause of Action against Defendant Hofstra for breach of contract and breach of the implied covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation damages to reputation, past and future economic losses, loss of educational and career opportunities plus prejudgment interest.

v.    such other and further relief as the Court deems just and proper.

**Dated: New York, New York**
      **September 3, 2024**

                                                **NESENOFF & MILTENBERG, LLP**
                                                **Attorneys for Plaintiff**

                                        **By:** ___/s/ Andrew Miltenberg____
                                                **Andrew T. Miltenberg, Esq.**
                                                **Stuart Bernstein, Esq.**
                                                **Helen J. Setton, Esq.**
                                                **363 Seventh Avenue, Fifth Floor**
                                                **New York, New York 10001**
                                                **Tel: (212) 736-4500**
                                                amiltenberg@nmllplaw.com
                                                sbernstein@nmllplaw.com
                                                hsetton@nmllplaw.com